# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| CALIBER HOME LOANS, INC., <br> 1525 SOUTH BELT LINE RD. <br> COPPELL, TX 75019 <br><br>         Plaintiff, <br><br>     vs. <br><br> FLORIDA INTRA STATE TITLE, LLC DBA SUNSET TITLE SERVICES <br> c/o DAVID H. LONGSPAUGH <br> 7031 STATE RD. 52 <br> BAYONET POINT, FL 34667 <br><br> AND <br><br> CHICAGO TITLE INSURANCE COMPANY, <br> 601 RIVERSIDE AVENUE <br> JACKSONVILLE, FL 32204 <br><br> ALSO SERVE AT: <br><br> C/O CHIEF FINANCIAL OFFICER, <br> P.O. BOX 6200 <br> 200 E. GAINES STREET <br> TALLAHASSEE, FL 32399 <br><br> AND <br><br> JOHN DOES 1-10, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CASE NO. <br> ) <br> ) <br> )    JUDGE: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT WITH JURY DEMAND ENDORSED HEREIN

Plaintiff, Caliber Home Loans Inc. ("Caliber"), by and through counsel, for its cause of action against Defendants Florida Intra State Title, LLC DBA Sunset Title ("Sunset Title"), Chicago Title Insurance Company ("Chicago Title") and John Does 1-10, alleges and states as follows:

### A.    Parties, Jurisdiction and Venue

1.     Caliber is a Delaware corporation with its principal offices located at 1525 South Belt Line Road, Coppell, Texas 75019.

2.     Sunset Title is a Florida limited liability company with its principal offices located at 7031 State Road 52, Bayonet Point, Florida 34667. Upon information and belief, all of Sunset Title's members, including its manager/member David Longspaugh, are citizens of Florida.

3.     Chicago Title is a Florida corporation with its principal offices located at 601 Riverside Avenue, Jacksonville, Florida 32204.

4.     John Does 1-10 are one or more individuals or entities who may or may not be affiliated with Sunset Title, and who were the recipient(s) of the wire transfer from Sunset Title described herein, and who, either directly or indirectly through the actions of Sunset Title, stole money from Caliber. Caliber is unaware of the identities of these individuals or entities at the time of filing.

2

5.    This Court has jurisdiction as to the claims against Sunset Title and Chicago Title pursuant to 28 U.S.C. § 1332(A)(2) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity between Caliber (a citizen of Delaware and Texas) and Sunset Title and Chicago Title (citizens of Florida). This Court also has jurisdiction over the claims against Sunset Title and Chicago Title based on Caliber's claim against John Does 1-10 and 28 U.S.C. § 1367.

6.    This Court has jurisdiction as to the claims against John Does 1-10, to the extent John Does 1-10 are not citizens of Texas or Delaware, pursuant to 28 U.S.C. § 1332(A)(2) because the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court also has jurisdiction as to the claims of John Does 1-10, regardless of the citizenship of John Does 1-10, pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1030(g), and 28 U.S.C. § 1367.

7.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

8.    Caliber has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and related to the recovery of Caliber's damages caused by the actions and inactions of Sunset Title, Chicago Title, and John Does 1-10.

9.    All conditions precedent to the bringing of this action have been satisfied, excused or waived.

**B.**  **Factual Allegations Applicable to All Claims**

**i.**  **Background**

10.     Caliber entrusted Sunset Title with funds to be disbursed as part of a real estate refinancing transaction.

11.     The funds entrusted by Caliber to Sunset Title were to be used to fulfill Caliber's obligation to pay off a prior mortgage as part of the refinancing transaction.

12.     Sunset Title failed to disburse the funds entrusted to it as instructed by Caliber and instead disbursed the funds pursuant to fraudulent instructions provided to Sunset Title. As a result, Caliber's funds were stolen.

13.     Because Caliber's funds were stolen, Caliber was forced to make a second payment to ensure that the prior mortgage was paid off as Caliber was obligated to do, and to ensure that its rights and the rights of its borrower were protected.

14.     Chicago Title agreed to insure and indemnify Caliber against Sunset Title's failure to distribute funds according to Caliber's closing instructions and Sunset Title's misappropriation of funds. Nevertheless, despite Sunset Title's obvious failure to follow Caliber's closing instructions and misappropriation of funds, Chicago Title has failed to fulfill its obligation to indemnify Caliber for its damages resulting from Sunset Title's failure.

15. Caliber brings this action to recover the damages resulting from the theft of its first payment and the second payment that Caliber was forced to make when its first payment was stolen.

16. Caliber is a national mortgage lender and loan servicer.

17. As part of Caliber's business it regularly engages in a variety of real estate transactions, including refinancing transactions.

18. In December 2020, Caliber served as the lender for a refinancing transaction involving borrower Carley Hollis ("Borrower") and a property located at 15530 Allmand Drive, Hudson, FL 34667 (the "Property").

19. As part of Borrower's refinancing transaction, Caliber was obligated to pay off a mortgage on the Property held by PennyMac Loan Services, LLC ("PennyMac"), with Borrower executing a new mortgage on the Property in favor of Caliber, the lender, as security for Borrower's promise to repay the amount of the Caliber loan to be used to pay off Borrower's mortgage with PennyMac.

20. Borrower's mortgage on the Property in favor of Caliber was to be a first priority mortgage after the mortgage in favor of PennyMac was paid off.

21. As part of this refinancing transaction, and to meet its obligation to pay off Borrower's mortgage on the Property in favor of PennyMac, Caliber wired funds to Sunset Title which, upon the closing of the refinancing, Sunset Title would

distribute to PennyMac, discharging Caliber's obligation to pay off Borrower's mortgage with PennyMac.

22.     When it engages in real estate transactions, Caliber transmits documents using an encrypted document portal.

23.     Caliber uses an encrypted document portal to transmit documents to prevent third parties from learning about the real estate transaction in order to prevent those third parties from seeking to intercept or divert funds which are to be transferred as part of the real estate transaction.

24.     The danger of fraudulent actors seeking to intercept or divert funds to be transferred within the real estate industry is well known and increasing in recent years, and those handling or transferring money as part of a real estate transaction, including borrowers, escrow agents, and issuing agents, have been repeatedly warned of these dangers.

25.     Prior to a real estate closing, a lender typically provides closing instructions to the closing agent, to ensure all documents and funds are properly accounted for and that all funds are properly disbursed.

### ii.      Borrower's Refinancing with Caliber Obligates Caliber to Pay Off Borrower's Prior Mortgage

26.     An application was submitted on behalf of Borrower to Caliber for a refinancing on the Property, and on November 9, 2020, Borrower's broker issued a Loan Estimate to Borrower, which Caliber accepted.

27.     The Loan Estimate described loan terms for Caliber's loan to Borrower, and provided an explanation of how the proceeds of Caliber's loan would be applied, namely that the entirety of the loan with the exception of closing costs would be used for "payoffs and payments," on account of Borrower's mortgage on the Property in favor of PennyMac.

28.     On November 16, 2020, Borrower executed the November 9, 2020 Loan Estimate and a Borrower Intent to Proceed Acknowledgment which confirmed her intent to proceed with the mortgage transaction as outlined in the Loan Estimate, including Caliber's pay off of her mortgage in favor of PennyMac.

29.     On December 24, 2020, Borrower executed a Closing Disclosure (which updated the Loan Estimate) which provided for a "payoff and payment" by Caliber to PennyMac of the amount then owed by Borrower on her mortgage in favor of PennyMac, $262,253.66 (rounded up to $262,254).

30.     Also, on December 24, 2020, Borrower executed a Uniform Residential Loan Application, which outlined the terms of her loan with Caliber, and specifically noted the unpaid balance on Borrower's mortgage in favor of PennyMac that was required to be paid. Under the details of transaction field within the application, that same amount, $262,254, was listed as "Refinance (incl. debts to be paid off)."

31.     On December 29, 2020, as part of the closing of the refinancing transaction, Borrower executed the final Closing Disclosure and the final Uniform

Residential Loan Application, both of which again specifically provided for the payoff by Caliber of Borrower's mortgage in favor of PennyMac. The December 29, 2020 Closing Disclosure and Uniform Residential Loan Application included the same language as the December 24, 2020 Closing Disclosure and Uniform Residential Loan Application regarding Caliber's obligation to pay off Borrower's mortgage in favor of PennyMac. True and accurate copies of the December 29, 2020 final Closing Disclosure and the final Uniform Residential Loan Application are attached hereto as **Exhibits A and B**.

        iii.       **Sunset Title Agrees to Distribute Funds Provided to it By Caliber to Pay Off Borrower's Mortgage with PennyMac, and Chicago Title Agrees to Insure Caliber for Sunset Title's Failure to Do So**

32.     Sunset Title is a Florida-based real estate company and Florida-licensed title insurer that also serves as a closing agent, escrow agent, and an issuing agent for real estate transactions.

33.     Issuing agents are tasked with, among other responsibilities, collecting and disbursing the funds from a real estate closing in accordance with instructions provided by the lender.

34.     In December 2020, Sunset Title served as the escrow agent and the issuing agent for Borrower's refinancing transaction for the Property.

35.     Caliber provided Sunset Title with an initial closing disclosure which reflected that Caliber's loan was to be used to pay off Borrower's mortgage with PennyMac.

36.     On December 16, 2020 via Caliber's encrypted document portal, Caliber provided Sunset Title with a PennyMac payoff letter with payment instructions for how, upon the closing of the refinancing transaction, Caliber's funds were to be disbursed to PennyMac.

37.     A true and accurate copy of the PennyMac payoff letter is attached hereto as **Exhibit C**.

38.     The PennyMac payoff letter served as Caliber's instructions to Sunset Title for how payment of Caliber's funds was to be made to PennyMac to pay off Borrower's mortgage with PennyMac.

39.     Caliber's agreement to use Sunset Title as the issuing agent and to participate in Borrower's refinancing transaction of the Property was contingent upon Caliber's receipt of a Closing Protection Letter, which would protect Caliber from a loss of funds in connection with the closing of Borrower's refinancing transaction for the Property conducted by Sunset Title as the issuing agent.

40.     On or about December 16, 2020, Caliber received the attached Closing Protection Letter, issued by Chicago Title, which acknowledged Sunset Title's role as the issuing agent for Borrower's refinancing transaction on the Property, on behalf

of Chicago Title, and Chicago Title's agreement to indemnify Caliber for a loss of funds in connection with the closing of Borrower's refinancing transaction for the Property conducted by Sunset Title as the issuing agent. A true and accurate copy of the Closing Protection Letter is attached hereto as **Exhibit D**.

41.     **Exhibit D** explicitly indicates that Chicago Title will be obligated to indemnify Caliber for a loss caused by the failure of Sunset Title (as issuing agent) to comply with Caliber's written closing instructions or fraud, theft, dishonesty or misappropriation by Sunset Title of the funds provided to it by Caliber.

42.     Chicago Title is also a Florida-licensed title insurer and served as the title insurer for Borrower's refinancing transaction on the Property, with Sunset Title as its issuing agent.

43.     Caliber's agreement to use Sunset Title as the issuing agent and to participate in Borrower's refinancing transaction of the Property was also contingent on Chicago Title issuing a title insurance policy to insure Caliber, as the lender, in connection with Borrower's refinancing transaction of the Property.

44.     A true and accurate copy of the Policy of Title Insurance issued by Chicago Title, with Caliber as the insured, is attached hereto as **Exhibit E**.

45.     On December 29, 2020, the date of the closing of Borrower's refinancing transaction for the Property, Sunset Title received the loan package from Caliber via Caliber's encrypted document portal. Together, the loan package

represented all documents necessary for the closing of Borrower's refinancing transaction.

46.     Through the documents contained in the loan package, including a promissory note and a mortgage which Borrower would execute in favor of Caliber, Borrower would grant Caliber a mortgage interest in the Property in exchange for a loan to Borrower, with Caliber obligated to use the loan proceeds to pay off Borrower's PennyMac mortgage. Among the documents which were part of the loan package which reflected this obligation were the final Closing Disclosure, the final Uniform Residential Loan Application, and an American Land Title Association Settlement Statement Form (the "Settlement Statement").

47.     The Settlement Statement noted the amount of the payoff owed to PennyMac, and which was to be paid by Sunset Title using funds provided to it by Caliber, of $262,253.66. Thus, the Settlement Statement reflected Caliber's obligation to pay off Borrower's PennyMac mortgage as part of Borrower's refinancing transaction for the Property. The Settlement Statement was signed by both Borrower and by Donna Campbell, the officer/escrow officer on behalf of Sunset Title.

48.     A true and accurate copy of the Settlement Statement is attached hereto as **<u>Exhibit F</u>**.

49.    Ms. Campbell was authorized to sign the Settlement Statement on behalf of Sunset Title.

50.    In signing the Settlement Statement, Ms. Campbell represented that she had "reviewed the Closing Disclosure, the settlement statement, the lender's closing instructions and any and all other forms relative to the escrow funds, including any disclosure of the Florida title insurance premiums being paid, and I agree to disburse the escrow funds in accordance with the terms of this transaction and Florida law."

51.    In signing the Settlement Statement, Borrower indicated that the disbursements therein, including Caliber's pay off of Borrower's PennyMac mortgage, were "a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction" and authorized the disbursement of funds in accordance with this statement.

52.    Therefore, Ms. Campbell, and Sunset Title, were obligated to distribute any funds provided by Caliber to Sunset Title in accordance with Caliber's instructions for how to distribute those funds, in accordance with the Settlement Statement.

53.    The loan package that Caliber provided to Sunset Title contained the information needed for the closing of Borrower's refinancing transaction concerning the Property, including Caliber's closing instructions (the "Closing Instructions"). The Closing Instructions did not modify the previously provided payment

instructions for the payment to PennyMac, nor provide that Sunset Title could rely on instructions from anyone other than Caliber as to how to disburse Caliber's funds to PennyMac.

54.   Therefore, Sunset Title was obligated to distribute the funds provided to it by Caliber to PennyMac in accordance with Borrower's agreement with Caliber and Caliber's instructions to Sunset Title.

### iv.   Sunset Title Fails to Pay PennyMac as Instructed, Preventing Caliber From Paying Off Borrower's Mortgage with PennyMac

55.   Borrower executed the required documents for the closing of the refinancing transaction concerning the Property on December 29, 2020, including the mortgage and promissory note in favor of Caliber, the final Closing Disclosure, the final Uniform Residential Loan Application and the Settlement Statement.

56.   Sunset Title received the original documents executed by Borrower as part of the closing of the refinancing transaction via UPS on December 31, 2020.

57.   As of December 31, 2020, Sunset Title was in possession of funds paid by Caliber to Sunset Title (via wire transfer) in the amount of $262,253.66.

58.   The funds paid by Caliber to Sunset Title were to be distributed to PennyMac, in accordance with Caliber's instructions and Borrower's authorization, to pay off Borrower's mortgage in favor of PennyMac on the Property.

59.     However, on December 31, 2020, as a result of Sunset Title's lack of security procedures, Sunset Title claims it received a fraudulent payoff statement via eFax, which contained false wiring instructions for the payment to PennyMac.

60.     The fraudulent payoff statement was sent by one or more of John Does 1-10.

61.     A true and accurate copy of the fraudulent payoff statement which Sunset Title received via eFax is attached hereto as **Exhibit G**.

62.     In order to send **Exhibit G**, John Does 1-10 had to know of or have access to, at a minimum: 1) the fact that PennyMac had a mortgage on the Property, 2) the correct PennyMac payoff statement sent by Caliber to Sunset Title; 3) the fact that Sunset Title was serving as the issuing agent for Borrower's refinancing transaction for the Property; 4) the fact that funds from Borrower's refinancing transaction had closed on or about December 29, 2020 and that the funds related to that transaction were to be disbursed on or about December 31, 2020.

63.     In order to learn or gain access to this information, John Does 1-10 must have accessed the computers, networks, or email servers of Sunset Title.

64.     Caliber only transmitted information to Sunset Title concerning Borrower's refinancing transaction for the Property using its encrypted document portal and there was no unauthorized access to the encrypted document portal during

the time Caliber was communicating with Sunset Title regarding Borrower's refinancing transaction for the Property.

65.    As a result, John Does 1-10 gained access to the information needed to transmit the fraudulent payoff statement to Sunset Title through Sunset Title's computers, networks, or email servers.

66.    To the extent Sunset Title did not permit John Does 1-10 to have such access, this access was unauthorized.

67.    Sunset Title's computers, networks, and email servers are all involved in, and/or affect interstate commerce, as is confirmed by Sunset Title's use of its computers, networks, and email servers, at least some of which were located in Florida, to communicate with, and store information received from, Caliber, which was stored in and/or sent from outside of Florida.

68.    The false wiring instructions within the fraudulent payoff statement were different from the payment instructions that Caliber had previously provided, were not authorized by Caliber, and could not have overridden Caliber's payment instructions as Caliber never authorized anyone other than Caliber to dictate the instructions of how Caliber's funds would be disbursed to PennyMac.

69.    **Exhibit G** is an obvious copy of **Exhibit C**, and even retained the December 14, 2020 date on the second page that had been present on **Exhibit C**, even though **Exhibit G** was sent on December 31, 2020, 17 days later.

70.     Among the differences between **Exhibit C** (the correct payoff statement) and **Exhibit G** (the false payoff statement) are the following: wiring instructions listed a different account number and a different bank; deletion of instructions for payment via check; deletion of a PennyMac phone number; and the replacement of a PennyMac phone number with a different phone number.

71.     However, **Exhibit G** did not change the payoff amount, and the payoff amount provided in **Exhibit C** was good through December 31, 2020 in any event.

72.     After its receipt of the fraudulent payoff statement (**Exhibit G**) via eFax, Sunset Title never contacted Caliber regarding the purported change in the wiring instructions for funds provided to it by Caliber even though **Exhibit G** did not even purport to come from Caliber.

73.     Sunset Title never contacted PennyMac regarding the purported change in the wiring instructions for funds to be distributed to PennyMac.

74.     To the extent Sunset Title was not complicit in the theft, Sunset Title failed to implement proper security procedures to prevent unauthorized access to its computers, networks and/or email servers or to prevent its receipt of fraudulent wiring instructions, and, upon receipt of the fraudulent wiring instructions, used poor procedures to review the fraudulent wiring instructions and, as a result, failed to identify the obviously fraudulent nature of the fraudulent wiring instructions.

75.    On December 31, 2020, Sunset Title wrote up instructions for a wire transfer for the funds entrusted to it by Caliber and to be distributed to PennyMac based on the fraudulent wiring instructions.

76.    On January 4, 2021, the wire transfer of the funds in accordance with the fraudulent wiring instructions was consummated.

77.    As a result of Sunset Title's actions, the funds were not received by PennyMac and were instead stolen by John Does 1-10.

78.    A total of $262,253.66, that had been provided by Caliber to Sunset Title, was stolen as a direct consequence of Sunset Title's or its agents' participation in the theft or its security failures, poor procedures, and resulting improper wiring instructions.

79.    Caliber only became aware of the theft in February 2021, after Borrower received multiple messages from PennyMac regarding late mortgage payments.

80.    Sunset Title never contacted Caliber to inform Caliber that the funds to be distributed to PennyMac were stolen.

81.    In February 2021, Caliber spoke with both Donna Campbell, the officer/escrow officer for Sunset Title for Borrower's refinancing transaction and David Longspaugh, the manager/member of Sunset Title. They both confirmed that,

at that time, Sunset Title had not notified either Borrower or Caliber that the Caliber funds had been stolen.

82.     Furthermore, Mr. Longspaugh indicated to Caliber that, as of February 2021, Sunset Title had not done any due diligence from an IT standpoint regarding its security and process failures regarding the security of its computers, networks and/or email servers, or with respect to receiving, and disbursing funds pursuant to, the fraudulent payoff statement and the false wiring instructions.

### v.     Caliber is Required to Make a Direct Payment to PennyMac to Pay Off Borrower's PennyMac Mortgage Because of Sunset Title's Failures

83.     As a result of Sunset Title's failure to disburse Caliber's funds to PennyMac as part of Borrower's refinancing transaction, in February 2021, Borrower's mortgage in favor of PennyMac on the Property had not been paid off and had not been released.

84.     As a result, in February 2021, PennyMac retained a first priority lien interest on the Property and Caliber had not fulfilled its obligation to pay off Borrower's mortgage with PennyMac.

85.     At that point, to fulfill its obligation to Borrower to pay off Borrower's mortgage with PennyMac, to protect the first priority lien status of Borrower's mortgage in favor of Caliber, and to prevent a foreclosure or other action by

PennyMac against Borrower or the Property, Caliber made a direct payment to PennyMac in order to complete the payoff of Borrower's PennyMac mortgage.

86.     The amount of that direct payment from Caliber to PennyMac was $264,049.68, which was the amount then owed by Borrower on her mortgage with PennyMac.

87.     Thereafter, PennyMac released its mortgage on the Property.

88.     This payment would not have been required were it not for the actions and inactions of Sunset Title as described herein.

89.     Caliber has demanded full reimbursement of its damages from Sunset Title.

90.     However, Sunset Title has refused to reimburse Caliber for the amount of its direct payment to PennyMac and Caliber has received no reimbursement at all from Sunset Title.

> **vi.** **Chicago Title Refuses to Compensate Caliber For Its Damages Resulting from Sunset Title's Failure to Follow Caliber's Closing Instructions to Pay Off Borrower's Mortgage With PennyMac**

91.     On June 30, 2021, through undersigned counsel, Caliber submitted a notice of claim to Chicago Title for the damages caused by Sunset Title's actions and inactions, as outlined herein, specifically including Sunset Title's failure to follow Caliber's Closing Instructions and Sunset Title's misappropriation of Caliber's funds.

92.    Undersigned counsel received a request for additional documents from Chicago Title on July 7, 2021, and provided those documents on July 8, 2021.

93.    By July 8, 2021, Caliber had provided Chicago Title with the Closing Protection Letter issued by Chicago Title to Caliber, the Title Insurance Policy issued by Chicago Title with Caliber as the insured, the Settlement Statement, and the Chicago Title's title commitment for the Property.

94.    Chicago Title confirmed receipt of all of the documents submitted to it by Caliber in conjunction with Caliber's Notice of Claim.

95.    On July 28, 2021, undersigned counsel spoke with a representative of Chicago Title concerning Caliber's Notice of Claim and accompanying documents submitted to Chicago Title.

96.    At no time during that conversation or after that conversation did Chicago Title request additional documents from Caliber in order to investigate or process Caliber's notice of claim.

97.    On August 6, 2021, Chicago Title sent the undersigned a letter which indicated that Chicago Title was "still in the process of investigating your client's claim." At the same time, Chicago Title offered to settle Caliber's notice of claim for a small fraction of Caliber's damages.

98.    Having received no further communication from Chicago Title, the undersigned responded to Chicago Title's August 6, 2021 letter via email on August

19, 2021 and requested that Chicago Title provide its final position with respect to its determination as to Caliber's notice of claim no later than August 24, 2021.

99.     Chicago Title did not respond until August 25, 2021. On August 25, 2021, Chicago Title responded that it was reviewing the August 19, 2021 email from undersigned counsel and would "respond shortly."

100.    In response, undersigned counsel indicated that Caliber expected a final response to its notice of claim from Chicago Title by August 27, 2021.

101.    On August 27, 2021, Chicago Title again indicated that it was reviewing the August 19, 2021 email from undersigned counsel and that Caliber would receive a "response shortly."

102.    On September 2, 2021, Chicago Title indicated the August 19, 2021 email from undersigned counsel was still "under review."

103.    Caliber has not received any reimbursement or indemnification for its damages from Sunset Title, Chicago Title, or from any other source.

## <u>COUNT I- BREACH OF CONTRACT (AGAINST SUNSET TITLE-SETTLEMENT STATEMENT)</u>

104.    Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-103 of the Complaint.

105.    The Settlement Statement is a valid and binding contract through which Sunset Title agreed to serve as the closing/escrow agent as well as the issuing agent

for Borrower's refinancing transaction for the Property, for which Sunset Title received certain valuable consideration, including a closing fee of $495.

106.   Through the Settlement Statement, Sunset Title agreed to disburse Caliber's funds pursuant to the terms of Borrower's refinancing transaction, and specifically according to Caliber's Closing Instructions.

107.   As a result, through the Settlement Statement, Sunset Title agreed to act on behalf of Caliber, and Caliber is entitled to enforce the Settlement Statement, at a minimum, as a third-party beneficiary.

108.   Caliber is also entitled to enforce the Settlement Statement on behalf of Borrower based on the principle of equitable subrogation.

109.   Caliber relied on the terms of the Settlement Statement, and specifically Sunset Title's agreement to abide by Caliber's closing and payment instructions, in entrusting funds to Sunset Title.

110.   To the extent any obligations were imposed on it by the Settlement Statement, Caliber complied with those obligations by: providing all documents to Sunset Title necessary for the closing of Borrower's refinancing transaction; providing funds to Sunset Title for distribution to PennyMac; providing Sunset Title with detailed Closing Instructions; providing Sunset Title with payment instructions for how to distribute Caliber's funds to PennyMac.

111.   Borrower complied with all obligations imposed on her by the Settlement Statement and executed all documents necessary for the closing of her refinancing transaction.

112.   Sunset Title failed to comply with its obligations under the Settlement Statement when it failed to disburse funds provided to it by Caliber to PennyMac in accordance with Caliber's instructions for how to disburse those funds and instead disbursed the funds pursuant to false wiring instructions, which were never authorized by Caliber, did not even purport to come from Caliber, and which allowed the funds to be stolen.

113.   In doing so, Sunset Title materially breached the Settlement Statement and caused harm to both Borrower and Caliber. This harm was the result of the failure to pay off the mortgage in favor of PennyMac on the Property as was Caliber's obligation, and included the charges and fees imposed on Borrower, a risk of foreclosure on the Property, and devalued and risked Caliber's mortgage interest in the Property based on the continuation of the prior mortgage in favor of PennyMac.

114.   As a result of Sunset Title's breach of its obligations under the Settlement Statement and the theft of the funds to be distributed to PennyMac, Caliber has suffered damages, including actual damages of $264,049.68, the amount of its subsequent payment to PennyMac.

115.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

116.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property and to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property, all of which resulted from Sunset Title's failure to distribute funds to PennyMac as instructed.

117.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

118.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

119.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

120.   Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

## COUNT II- BREACH OF CONTRACT (AGAINST SUNSET TITLE- CLOSING INSTRUCTIONS)

121.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-120 of the Complaint.

122.   Sunset Title was contractually bound to effectuate Borrower's refinancing transaction for the Property as the closing/escrow agent and issuing agent, including distributing funds provided to it by Caliber pursuant to the Closing Instructions and the payment instructions provided by Caliber to Sunset Title.

123.   The Closing Instructions are a binding contract between Caliber and Sunset Title, the terms of which Sunset Title accepted and assented to by: accepting funds provided to it by Caliber; performing the closing of Borrower's refinancing

transaction for the Property; and ultimately disbursing the funds provided to it by Caliber.

124.   In so doing, as per the Closing Instructions, Sunset Title manifested its intention to abide by the terms of the Closing Instructions, and in fact, per the terms of the Closing Instructions, by doing so confirmed that it would comply with the Closing Instructions.

125.   The Closing Instructions specifically provided that "[i]n the event Closing Agent [Sunset Title] fails to close in accordance with the Closing Instructions and instructions below, Closing Agent will reimburse Caliber for any out of pocket costs resulting therefrom."

126.   In addition, Caliber is entitled to enforce any interest Borrower may have had in the Closing Instructions under the principle of equitable subrogation.

127.   Caliber performed all obligations imposed on it by the Closing Instructions.

128.   To the extent the Closing Instructions imposed any obligations on Borrower, she performed all obligations imposed on her by the Closing Instructions.

129.   The Closing Instructions required Sunset Title to distribute the funds entrusted to it in the manner instructed by Caliber and to which Borrower had agreed—to PennyMac to pay off Borrower's mortgage with PennyMac. The Closing Instructions did not permit Sunset Title to distribute funds provided to it by Caliber

in any other manner which Caliber did not authorize and to which Borrower had not agreed.

130.   Sunset Title failed to comply with its obligations under the Closing Instructions when it failed to disburse funds provided to it by Caliber to PennyMac in accordance with Caliber's instructions. Instead, Sunset Title disbursed the funds pursuant to false wiring instructions provided after Caliber's Closing Instructions, which were never authorized by Caliber and did not even purport to come from Caliber, and which allowed the funds to be stolen by John Does 1-10.

131.   In doing so, Sunset Title materially breached the Closing Instructions and caused harm to both Borrower and Caliber. This harm was the result of the failure to pay off the mortgage in favor of PennyMac on the Property, and included the charges and fees imposed on Borrower and an impairment of Caliber's mortgage interest in the Property based on the continuation of Borrower's prior mortgage in favor of PennyMac.

132.   As a result of Sunset Title's breach of its obligations under the Settlement Statement and the theft of the funds to be distributed to PennyMac, Caliber has suffered damages, including actual damages of $264,049.68, the amount of its subsequent payment to PennyMac.

133.   Caliber's subsequent payment of $264,049.68 to PennyMac is an out of pocket cost resulting from Sunset Title's failure to follow Caliber's Closing

Instructions, and Sunset Title is obligated to reimburse Caliber for the subsequent payment.

134.   Sunset Title has failed to reimburse Caliber for the cost of its subsequent payment to PennyMac.

135.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

136.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property, to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and because of the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

137.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

28

138.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

139.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

140.  Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

## COUNT III- UNJUST ENRICHMENT (AGAINST SUNSET TITLE)

141.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-140 of the Complaint.

142.   This Count is plead in the alternative to Counts I and II, and to the extent that the Court determines Sunset Title has no enforceable contractual obligations to Caliber, either directly or through the principal of equitable subrogation.

143.  Caliber and Borrower conferred a benefit on Sunset Title by: 1) allowing Sunset Title to serve as the closing/escrow agent and issuing agent for the

refinancing transaction for Borrower's property, for which Sunset Title profited as described herein; and 2) by entrusting Sunset Title with the funds from Caliber's loan to Borrower which Caliber wired to Sunset Title, and which were to be used solely to pay off Borrower's mortgage with PennyMac.

144.    Sunset Title accepted these benefits and has retained these benefits by allowing Caliber's funds which were intended to be paid to PennyMac to pay off Borrower's mortgage with PennyMac to instead be stolen by John Does 1-10. This required Caliber to make its subsequent payment to PennyMac as described herein. However, Sunset Title has failed to reimburse or compensate Caliber for the money stolen from Caliber.

145.    Sunset Title provided no value to Caliber and/or Borrower in its role as closing/escrow agent or issuing agent, and failed to comply with the obligations imposed on it, and instead actively harmed Caliber and Borrower by allowing Caliber's funds to be stolen by John Does 1-10 rather than paid to PennyMac.

146.    Therefore, it would be inequitable to allow Sunset Title to retain the benefits provided to it by Caliber and/or by Borrower.

147.    To the extent that Borrower has a claim against Sunset Title for unjust enrichment, Caliber has the right to enforce that claim through equitable subrogation.

148.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

149.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property and to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

150.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

151.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

152.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

153.   Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

## COUNT IV- COMMON LAW INDEMNIFICATION (AGAINST SUNSET TITLE)

154.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-153 of the Complaint.

155.   As part of Borrower's refinancing transaction for the Property, and as reflected in the documents executed by Borrower as part of the loan package on December 29, 2020, Borrower agreed to give Caliber a security interest in the Property, as reflected in a mortgage given by Borrower to Caliber, in exchange for a loan by Caliber, to be used to pay off Borrower's mortgage with PennyMac.

156.   Caliber's obligation to pay off Borrower's mortgage with PennyMac as part of Borrower's refinancing transaction is reflected in a number of documents

executed by Borrower, including the final Closing Disclosure, the final Uniform Residential Loan Application and the Settlement Statement.

157.   Thus, in its role as lender for Borrower's refinancing transaction for the Property, Caliber agreed to pay off Borrower's mortgage with PennyMac.

158.   Even though Caliber explicitly instructed Sunset Title to use the loan proceeds to pay off Borrower's mortgage with PennyMac, gave Sunset Title the funds to be used to pay off Borrower's PennyMac mortgage, and gave Sunset Title proper wiring instructions through which Sunset Title could have paid off Borrower's PennyMac mortgage, Sunset Title failed to follow those instructions.

159.   Instead, Sunset Title disbursed Borrower's loan proceeds given to it by Caliber pursuant to false wiring instructions contained in the fraudulent payoff letter sent to Sunset Title by John Does 1-10 and as a result the loan proceeds were stolen by John Does 1-10 and were not used to pay off Borrower's mortgage with PennyMac.

160.   Thus, through no fault of its own and due to the actions and inactions of Sunset Title as described herein, as of February 2021, Caliber had failed to pay off Borrower's PennyMac mortgage as Caliber was obligated to do.

161.   Thus, in February 2021, Caliber was required to make a subsequent payment to PennyMac of $264,049.68 in order to pay off Borrower's PennyMac mortgage.

162.   If Caliber had not made that subsequent payment to PennyMac, Caliber would have failed to fulfill its obligation to Borrower to pay off Borrower's PennyMac mortgage.

163.   Only in having made that subsequent payment to PennyMac did Caliber ensure that it would face no liability to Borrower for the failure to pay off Borrower's PennyMac mortgage.

164.   While it was Caliber that was obligated to pay off Borrower's mortgage with PennyMac and would have faced the consequences for its failure to do so, Sunset Title was at fault for Caliber's failure to have done so as part of Borrower's refinancing transaction based on its failure to disburse funds to PennyMac as Caliber had instructed, and as Sunset Title had agreed to do.

165.   Therefore, Sunset Title was responsible for Caliber's failure (prior to its subsequent payment to PennyMac) to fulfill its obligation to Borrower to pay off Borrower's mortgage with PennyMac.

166.   Caliber's February 2021 subsequent payment to PennyMac, to fulfill its obligation to pay off Borrower's mortgage with PennyMac, was the result of, and derived from, Sunset Title's wrongful actions in improperly disbursing the funds given to it by Caliber which were to have been disbursed to PennyMac but which were instead stolen by John Does 1-10.

167.   Caliber is thus entitled to common law indemnity from Sunset Title for $264,049.68, the full amount of Caliber's subsequent payment to PennyMac to fulfill its obligation to pay off Borrower's mortgage with PennyMac and which was required because of Sunset Title's actions and inactions as described herein.

## COUNT V- CONVERSION (AGAINST SUNSET TITLE AND JOHN DOES 1-10)

168.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-167 of the Complaint.

169.   Caliber entrusted funds in the amount of $262,253.66 to Sunset Title.

170.   These were identifiable funds which were transferred from Caliber to Sunset Title via wire transfer and held separately by Sunset Title for transfer to PennyMac to pay off Borrower's mortgage with PennyMac upon the closing of Borrower's refinancing transaction.

171.   Caliber entrusted these funds to Sunset Title for the limited purpose of Sunset Title transferring the funds to PennyMac upon consummation of Borrower's refinancing transaction concerning the Property.

172.   Caliber only authorized Sunset Title to transfer the funds to PennyMac upon consummation of Borrower's refinancing transaction concerning the Property, and, to the extent the funds were not transferred to PennyMac, the funds were to be returned to Caliber.

173.   However, Sunset Title neither transferred the funds to PennyMac nor returned them to Caliber, and instead transferred the funds pursuant to false wiring instructions which allowed the funds to be stolen by John Does 1-10.

174.   In doing so, Sunset Title wrongfully asserted dominion over the funds provided to it by Caliber in a manner that is inconsistent with the rights of Caliber, the owner of the funds, and which deprived Caliber of its right of possession of the funds.

175.   In addition, Fla. Sat. § 626.8473 provides "(1) A title insurance agent may engage in business as an escrow agent as to funds received from others to be subsequently disbursed by the title insurance agent in connection with real estate closing transactions involving the issuance of title insurance binders, commitments, policies of title insurance, or guarantees of title, provided that a licensed and appointed title insurance agent complies with the requirements of s. 626.8417, including such requirements added after the initial licensure of the agent."

176.   Fla. Sat. § 626.8473 also provides "(2) All funds received by a title insurance agent as described in subsection (1) shall be trust funds received in a fiduciary capacity by the title insurance agent and shall be the property of the person or persons entitled thereto."

177.   Fla. Stat. § 626.8473(7) provides for criminal liability for "A title insurance agent, or any officer, director, or employee thereof, or any person

associated therewith as an independent contractor for bookkeeping or similar purposes, who converts or misappropriates funds received or held in escrow or in trust by such title insurance agent, or any person who knowingly receives or conspires to receive such funds…"

178.   Sunset Title holds a valid license as a "title insurance agency – corp or firm" from the State of Florida.

179.   Sunset Title, as closing/escrow agent and issuing agent, received funds from Caliber to be disbursed by Sunset Title in connection with the closing of Borrower's refinancing transaction for the property, and Sunset Title agreed that those funds were escrow funds, but failed to properly disburse those funds, thereby misappropriating the funds and committing conversion.

180.   The funds remained identifiable upon their transfer to John Does 1-10 pursuant to the false wiring instructions.

181.   After receipt of the funds, John Does 1-10 have wrongly asserted a dominion over the funds in a manner that is inconsistent with the rights of Caliber, the owner of the funds, and which deprived Caliber with its right of possession of the funds.

182.   Sunset Title's and John Does 1-10's unauthorized acts of converting the funds has deprived Caliber of the funds from January 4, 2021, the date on which Sunset Title initiated the unauthorized wire transfer of the funds, to the present.

183.   Caliber has demanded the return of the funds from Sunset Title, but has not received any portion of the funds.

184.   Therefore, Caliber has been damaged as a direct and proximate result of Sunset Title's actions, including actual damages in the amount of the converted funds, $262,253.66.

185.   To the extent that Borrower has a claim against Sunset Title for conversion, Caliber has the right to enforce that claim through equitable subrogation.

186.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

187.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property, to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and because of the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

188.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's

refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

189.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

190.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

191.   Allowing Caliber to recover from Sunset Title and/or John Does 1-10 through equitable subrogation will not work any injustice on the rights of a third party as both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations to Borrower and to Caliber, thus converting the funds that Caliber entrusted to it, and John Does 1-10 that stole funds from Caliber which were to be used to pay off Borrower's mortgage with PennyMac, causing harm to Borrower and to Caliber. Sunset Title and John Does 1-10 should thus be held responsible for that harm.

192.   Furthermore, Caliber is entitled to punitive damages because the circumstances surrounding the conversion show fraud, actual malice, deliberate

violence or oppression, or such gross negligence as to indicate a wanton disregard of the rights of others.

193.  Sunset Title's actions show fraud, actual malice, deliberate violence or oppression, or such gross negligence as to indicate a wanton disregard of the rights of others, including Borrower and Caliber. Those actions include: a lack of security procedures to prevent receiving, or wiring funds pursuant to, false wiring instructions when such threat was well known; the failure to discover the obviously fraudulent nature of the false wiring instructions which Sunset Title received; the failure to communicate with Caliber prior to wiring funds pursuant to the false wiring instructions; the disbursement of Caliber's funds based on false wiring instructions which did not even purport to come from Caliber; the failure to notify Caliber of the theft of the funds; and the subsequent failure to return the stolen funds to Caliber or to provide any other relief to Caliber or to Borrower

194.  John Does 1-10's actions, including the sending of the fraudulent payoff statement and the false wiring instructions, show fraud, actual malice, deliberate violence or oppression, or such gross negligence as to indicate a wanton disregard of the rights of others, including Borrower and Caliber.

## COUNT VI- BREACH OF FIDUCIARY DUTY (AGAINST SUNSET TITLE)

195.  Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-194 of the Complaint.

40

196.   Through the Settlement Statement, Sunset Title explicitly agreed to serve as the closing/escrow agent for Borrower's refinancing transaction for the Property.

197.   An escrow agent or a closing agent is bound by the fiduciary duty to exercise reasonable skill and ordinary diligence in discharging its duties.

198.   An escrow agent or a closing agent also is bound by the fiduciary duties imposed on it by agreement of the parties to the transaction.

199.   Furthermore, an escrow agent or a closing agent is bound by the fiduciary duties which it voluntarily undertakes to perform.

200.   The imposition of a fiduciary duty imposes an obligation on the fiduciary to act primarily for the benefit of another.

201.   A fiduciary is also obligated to disclose material facts to those to whom it owes a fiduciary duty.

202.   Fiduciary duties for an escrow agent or a closing agent extend to all of the principal parties to a transaction, as a duty implied by law, regardless of the terms of any contractual agreement.

203.   Caliber, as the lender for Borrower's refinancing transaction for the Property, was a principal party to the refinancing transaction for which Sunset Title served as the escrow/closing agent.

204.   Sunset Title owed Caliber a fiduciary duty.

205.   Sunset Title owed Borrower a fiduciary duty.

206.   To the extent Borrower has any claim against Sunset Title for breach of fiduciary duty, Caliber is entitled to enforce that claim based on equitable subrogation.

207.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

208.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property, to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and due to the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

209.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

210.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

211.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

212.   Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

213.   Fla. Sat. § 626.8473 provides "(1) A title insurance agent may engage in business as an escrow agent as to funds received from others to be subsequently disbursed by the title insurance agent in connection with real estate closing transactions involving the issuance of title insurance binders, commitments, policies of title insurance, or guarantees of title, provided that a licensed and appointed title insurance agent complies with the requirements of s. 626.8417, including such requirements added after the initial licensure of the agent."

214.   Fla. Sat. § 626.8473 also provides "(2) All funds received by a title insurance agent as described in subsection (1) shall be trust funds received in a fiduciary capacity by the title insurance agent and shall be the property of the person or persons entitled thereto."

215.   Fla. Stat. § 626.8473(7) provides for criminal liability for "A title insurance agent, or any officer, director, or employee thereof, or any person associated therewith as an independent contractor for bookkeeping or similar purposes, who converts or misappropriates funds received or held in escrow or in trust by such title insurance agent, or any person who knowingly receives or conspires to receive such funds…"

216.   Sunset Title holds a valid license as a "title insurance agency – corp or firm" from the State of Florida.

217.   Sunset Title, as closing/escrow agent and issuing agent, received funds from Caliber to be disbursed by Sunset Title to PennyMac to pay off Borrower's mortgage with PennyMac in connection with the closing of Borrower's refinancing transaction for the property, and agreed that those funds were escrow funds.

218.   Sunset Title, by serving as the closing/escrow agent and issuing agent, in accepting the funds provided to it by Caliber, agreeing to hold those funds and then disburse the funds pursuant to Caliber's instructions, including through the Settlement Statement and the Closing Instructions, and by operation of law, was

44

subject to a fiduciary duty to exercise reasonable skill and ordinary diligence, to act in Caliber's and/or Borrower's best interest, and to disclose material facts to Caliber and/or Borrower.

219.   Therefore, Sunset Title held the funds provided to it by Caliber in trust, and in a fiduciary capacity, with the funds remaining Caliber's property to the extent the funds were not distributed to PennyMac in accordance with Caliber's instructions.

220.   Sunset Title breached its fiduciary duty regarding the funds provided to it by Caliber by failing to disburse those funds in accordance with Caliber's instructions, in failing to exercise even ordinary care regarding its disbursement of the funds, in failing to act in Caliber's or Borrower's best interest, and in failing to disclose material facts concerning the disbursement of funds to Caliber or to Borrower.

221.   Sunset Title failed to exercise reasonable skill or caution, act in Caliber's and/or Borrower's best interest, or disclose material facts to Caliber and/or Borrower, by its actions, including: disregarding Caliber's instructions for the disbursement of the funds provided by Caliber to Sunset Title; disbursing funds pursuant to obviously false wiring instructions which resulted in the theft of those funds; and failing to notify Caliber of Sunset Title's receipt of the false wiring

instructions, which did not even purport to come from Caliber, or of Sunset Title's disbursement of funds pursuant to the false wiring instructions.

222.  As a result, Sunset Title breached its fiduciary duties to Caliber and to Borrower.

223.  In doing so, Sunset Title caused harm to both Borrower and Caliber. This harm was the result of the failure to pay off Borrower's mortgage with PennyMac on the Property, and included the charges and fees imposed on Borrower, the impairment of Caliber's mortgage interest in the Property based on the continuation of the prior mortgage in favor of PennyMac, and the prevention of Caliber's completion of its obligation to pay off Borrower's mortgage with PennyMac.

224.  As a result of Sunset Title's breach of its fiduciary duties and the theft of the funds to be distributed to PennyMac, Caliber has suffered damages, including actual damages of $264,049.68, the amount of its subsequent payment to PennyMac made to complete its obligation to pay off Borrower's mortgage with PennyMac, as a direct and proximate result of Sunset Title's actions.

225.  Furthermore, Caliber is entitled to punitive damages because the circumstances surrounding Sunset Title's breach of fiduciary duty show fraud, actual malice, deliberate violence or oppression, or such gross negligence as to indicate a wanton disregard of the rights of others.

226.   Sunset Title's actions which entitle Caliber to punitive damages include: a lack of security procedures to prevent receiving, or wiring funds pursuant to, false wiring instructions when such threat was well known; the failure to discover the obviously fraudulent nature of the false wiring instructions; the failure to communicate with Caliber prior to wiring funds pursuant to the false wiring instructions which did not even purport to come from Caliber; the failure to notify Caliber of the theft of the funds; and the subsequent failure to return the stolen funds to Caliber or to provide any other relief to Caliber or to Borrower.

## COUNT VII- NEGLIGENCE (AGAINST SUNSET TITLE)

227.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-226 of the Complaint.

228.   Sunset Title had a legal duty to Caliber and to Borrower to handle and disburse the funds provided to it by Caliber in a commercially reasonable way. Specifically, for Borrower's refinancing transaction, Sunset Title had a legal duty to ensure that Borrower's mortgage with PennyMac was paid off.

229.   To the extent that Borrower has a claim against Sunset Title for negligence, Caliber has the right to enforce that claim through equitable subrogation.

230.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien

interest on the Property would have been impaired and without that payment Caliber would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

231.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property, to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and because of the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

232.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

233.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

234.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

235.    Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

236.    Sunset Title breached its duty to Caliber and/or Borrower regarding the handling and disbursing of the funds provided to it by Caliber by: failing to implement security procedures to prevent receiving, or wiring funds pursuant to, false wiring instructions; disregarding Caliber's instructions for the disbursement of the funds; disbursing funds pursuant to false wiring instructions when the falsity of those wiring instructions was obvious and Sunset Title should have known the instructions were false and the instructions did not even purport to come from Caliber; and not acting in a reasonable manner to notify Caliber of the disbursement of the funds pursuant to the false wiring instructions either before or after Sunset Title's disbursement of the funds.

237.    It was reasonably foreseeable that Sunset Title's breaches of its duty to Caliber would damage Caliber and/or Borrower.

238.    Specifically, it was reasonably foreseeable that Sunset Title's breaches of its duty to reasonably handle the funds provided to it by Caliber as part of

49

Borrower's refinancing transaction, and its failure to disburse those funds to PennyMac to pay off Borrower's mortgage with PennyMac, would require a subsequent payment to pay off Borrower's mortgage with PennyMac.

239.   As a result of Sunset Title's breach of its duties and the theft of the funds to be distributed to PennyMac, Caliber has suffered damages, including actual damages of $264,049.68, the amount of its subsequent payment to PennyMac. Borrower also suffered damages, including but not limited to, increased fees, charges, and other obligations to PennyMac.

## COUNT VIII- GROSS NEGLIGENCE (AGAINST SUNSET TITLE)

240.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-239 of the Complaint.

241.   Sunset Title had a legal duty to Caliber and to Borrower to handle and disburse the funds provided to it by Caliber in a commercially reasonable way.

242.   To the extent that Borrower has a claim against Sunset Title for gross negligence, Caliber has the right to enforce that claim through equitable subrogation.

243.   Had Caliber not made its subsequent payment of $264,049.68 to PennyMac, Borrower would have been liable to PennyMac for that amount, but Caliber would have also been damaged because, among other reasons, its lien interest on the Property would have been impaired and without that payment Caliber

would have failed to pay off Borrower's mortgage with PennyMac as Caliber was required to do.

244.   Caliber's subsequent payment to PennyMac was made to protect Caliber's interest in its mortgage on the Property, to protect Caliber from claims regarding the failure to pay off the PennyMac mortgage on the Property and because of the ongoing PennyMac mortgage on the Property because of Sunset Title's failure to distribute funds to PennyMac as instructed.

245.   Caliber was obligated to make its subsequent payment to PennyMac based on its agreement to pay off the PennyMac mortgage as part of Borrower's refinancing transaction. Caliber did so to protect its interest in the Property, to protect Borrower's interest in the Property, and to protect itself against claims from Borrower.

246.   Despite Caliber's obligation to pay off Borrower's mortgage with PennyMac, it was Borrower who was primarily liable for Borrower's mortgage to PennyMac.

247.   Caliber's subsequent payment to PennyMac paid off the entirety of Borrower's mortgage to PennyMac, and thus the entirety of Borrower's obligation to PennyMac, and resulted in PennyMac's release of its mortgage on the Property.

248.   Allowing Caliber to recover from Sunset Title through equitable subrogation will not work any injustice on the rights of a third party. Both Borrower

and Caliber performed all required obligations and it was Sunset Title that failed to perform its obligations, causing harm to Borrower and to Caliber, and requiring Caliber's subsequent payment to PennyMac. Sunset Title should thus be held responsible for that payment, required because of its actions or inactions.

249.   Sunset Title breached its duty regarding the handling and distribution of the funds provided to it by Caliber by: failing to implement security procedures to prevent receiving, or wiring funds pursuant to, false wiring instructions; disregarding Caliber's instructions for the disbursement of the funds; disbursing funds pursuant to false wiring instructions when the falsity of those wiring instructions was obvious and Sunset Title should have known the instructions were false, and the instructions did not even purport to come from Caliber; and not acting in a reasonable manner to notify Caliber of the disbursement of the funds pursuant to the false wiring instructions either before or after Sunset Title's disbursement of the funds.

250.   Attempts to steal real estate transaction funds through false wiring instructions are a well-known threat in the real estate industry, and Caliber takes steps to protect against this threat and consistently warns other parties to the real estate transactions in which it is involved of such threats.

251.   However, Sunset Title failed to use basic security policies or procedures that would protect against the disbursement of funds pursuant to such false wiring instructions.

252.   The fraudulent nature of the false wiring instructions pursuant to which Sunset Title disbursed the funds provided to it by Caliber was readily apparent from the face of the fraudulent payoff statement, including altered wiring instructions, inconsistent dates, and deleted or altered phone numbers.

253.   Sunset Title either failed to review the fraudulent payoff statement which contained the false wiring instructions at all before disbursing the funds, reviewed the fraudulent payoff statement and missed these obvious signs of fraud, or noticed the obvious signs of fraud and disbursed the money pursuant to the false wiring instructions anyway. Ultimately, Sunset Title disbursed Caliber's funds in a manner inconsistent with instructions provided to it by Caliber without ever checking with Caliber as to whether Caliber authorized its funds being distributed according to these false wiring instructions.

254.   As a result, Sunset Title either knew of should have known that its actions were dangerous, yet proceeded anyway.

255.   As a result of Sunset Title's breach of its duties and the theft of the funds to be distributed to PennyMac, Caliber has suffered damages, including actual damages of $264,049.68, the amount of its subsequent payment to PennyMac, which

was made to complete Caliber's obligation to pay off Borrower's mortgage with PennyMac that was to have been completed by Sunset Title's distribution of funds to PennyMac. Borrower also suffered damages, including but not limited to the imposition of additional fees and charges on Borrower's mortgage with PennyMac.

256.   All of these damages were the foreseeable consequence of the theft of Caliber's funds based on false wiring instructions. The theft of Caliber's funds through the use of false wiring instructions was itself foreseeable as a common threat and based on Sunset Title's failure to take even basic steps to protect against the theft of Caliber's funds.

257.   Sunset Title's actions, as described herein, indicate that Sunset Title acted either willfully or with reckless disregard or indifference to the likelihood its actions would cause harm to Caliber.

258.   Sunset Title, as described herein, engaged in gross negligence which indicated a wanton disregard for Caliber's rights.

259.   Caliber is also entitled to punitive damages for Sunset Title's actions.

## COUNT IX- BREACH OF CONTRACT/INDEMNIFICATION AGREEMENT (AGAINST CHICAGO TITLE- CLOSING PROTECTION LETTER)

260.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-259 of the Complaint.

261.   Chicago Title issued a Closing Protection Letter (**Exhibit D**) to Caliber which listed Sunset Title as the issuing agent for Borrower's refinancing transaction for the Property.

262.   The Closing Protection Letter is a binding and enforceable contract between Chicago Title and Caliber.

263.   Specifically, the Closing Protect Letter provides that "Your [Caliber] transmittal of Funds or documents to the Issuing Agent or Approved Attorney [Sunset Title] constitutes Your acceptance of this letter."

264.   The closing protection letter was issued on December 16, 2020, and Caliber transmitted both funds and documents thereafter to Sunset Title, as described herein, in connection with the closing of Borrower's refinancing transaction on or about December 29, 2020.

265.   To the extent the Closing Protection Letter imposed any obligations on Caliber, Caliber complied with all such obligations.

266.   The Closing Protection Letter was a requirement for Caliber to serve as the lender for Borrower's refinancing transaction for the Property and Caliber relied on it in agreeing to serve as lender.

267.   Chicago Title received valid consideration, including amounts charged as closing costs from the closing of Borrower's refinancing transaction and an

insurance premium in its role as title insurer for Borrower's refinancing transaction for the Property, including its issuance of the Closing Protection Letter.

268.   The Closing Protection letter provides that Chicago Title will indemnify Caliber for actual loss of funds incurred by Caliber in connection with the closing of Borrower's refinancing transaction for the Property, if: 1) Chicago Title issues or is obligated to issue a title insurance policy for Caliber's protection in connection with the closing of Borrower's refinancing transaction for the Property; 2) Caliber is the lender to be insured by the "Insured Mortgage;" 3) the aggregate of all funds Caliber transmitted to Sunset Title as issuing agent is less than $5,000,000.00; and 4) Caliber's loss is caused solely by the failure of Sunset Title, as Chicago Title's issuing agent, to comply with Caliber's Closing Instructions related to the disbursement of Caliber's funds or Sunset Title's fraud, theft, dishonesty, or misappropriation in handling Caliber's funds that relate to the disbursement of funds necessary to establish the status of the title, or the validity, enforceability, or priority of the lien of Caliber's mortgage on the Property.

269.   Chicago Title was contractually obligated to, and did, issue a title insurance policy for Caliber's protection in connection with Borrower's refinancing transaction for the Property (**Exhibit E**).

270. Caliber is the lender for Borrower's refinancing transaction for the Property and is secured by the related mortgage, which was the subject of the attached Policy for Title Insurance issued by Chicago Title.

271. The aggregate amount Caliber transmitted to Sunset Title was less than $5,000,000.

272. Caliber's loss of funds, as described herein, was caused by the theft of Caliber's funds which directly resulted from Sunset Title's failure to comply with Caliber's written Closing Instructions that related to disbursing funds to PennyMac and/or Sunset Title's fraud, theft, dishonesty, or misappropriation of Caliber's funds, the disbursement of which was necessary to secure the first priority status of Caliber's lien on the Property.

273. The failure of Sunset Title to comply with Caliber's written Closing Instructions regarding the payment to PennyMac prevented Caliber from paying off Borrower's mortgage with PennyMac as it was obligated to do and resulted in the continuation of PennyMac's mortgage on the Property which threated the lien priority of Caliber's mortgage on the Property.

274. While the Closing Protection Letter does provide certain exceptions to Chicago Title's duty to indemnify Caliber as outlined above, none of those exceptions are applicable to Caliber's loss of funds as described herein.

275.   Caliber is thus entitled to indemnification from Chicago Title in the amount of $262,253.66, the full amount of the funds which were misappropriated and converted by Sunset Title and John Does 1-10 because of Sunset Title's failure to comply with Caliber's written Closing Instructions that required the funds to be disbursed to PennyMac.

276.   On June 30, 2020, Caliber submitted a notice of claim to Chicago Title for indemnification of its damages with Chicago Title.

277.   Chicago Title has confirmed its receipt of Caliber's notice of claim.

278.   Caliber has provided all information and documents requested by Chicago Title.

279.   However, despite repeated follow-up from Caliber through undersigned counsel via phone and email, as described herein, Chicago Title has indicated that, two months after Caliber's submission of the notice of claim, it is still investigating the notice of claim.

280.   Chicago Title has failed to accept the notice of claim and has failed to provide any indication of what it is investigating or specify when its investigation will conclude.

281.   Furthermore, Chicago Title has not acknowledged its obligation to reimburse or indemnify Caliber for its damages and Caliber has received no payment from Chicago Title in connection with Caliber's notice of claim.

## COUNT X- BREACH OF CONTRACT/INSURANCE POLICY (AGAINST CHICAGO TITLE-TITLE INSURANCE POLICY)

282.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-281 of the Complaint.

283.   The title insurance policy issued by Chicago Title with Caliber as the insured (**Exhibit E**) is also a binding and enforceable contract for which Chicago Title received valuable consideration, including funds from the closing of Borrower's refinancing transaction and insurance premiums.

284.   To the extent the title insurance policy imposed any obligations on Caliber, Caliber fulfilled all such obligations.

285.   Through the title insurance policy, Chicago Title agreed to insure Caliber against, among other things, defects in title, and the invalidity or unenforceability of the lien of Caliber's mortgage upon the Property, when either were the result of forgery, fraud, or impersonation and against the lack of priority of the lien of Caliber's mortgage on the Property "over any other lien or encumbrance."

286.   As described herein, John Does 1-10 engaged in forgery, fraud, or impersonation, which, coupled with the actions and inactions of Sunset Title, prevented Caliber from fulfilling its obligation to pay off Borrower's mortgage with PennyMac.

287.   PennyMac's mortgage on the Property thus remained in place, with priority over Caliber's mortgage on the Property. Were it not for the forgery, fraud,

or impersonation of John Does 1-10 and the actions and inactions of Sunset Title, Caliber would have had an enforceable first priority mortgage on the Property.

288.   Thus, there was a lack of priority of Caliber's lien on the Property as well as a defect in title and/or an invalidity of Caliber's mortgage and/or lien on the Property, which was the result of the forgery, fraud, or impersonation of John Does 1-10 and the actions and inactions of Sunset Title.

289.   That lack of priority and defect and/or invalidity was only resolved by Caliber's subsequent payment to PennyMac, which resulted in the pay off and satisfaction of PennyMac's mortgage on the Property and the removal of PennyMac's lien on the Property.

290.   Caliber made the subsequent payment to PennyMac to pay off Borrower's mortgage with PennyMac because it was obligated to pay off Borrower's mortgage with PennyMac, yet, through no fault of its own, had failed to do so prior to the subsequent payment to PennyMac.

291.   Chicago Title was thus obligated to compensate Caliber for its losses associated with John Does 1-10's fraud and Sunset Title's actions and inactions, including the amount of Caliber's subsequent payment to PennyMac.

292.   On June 30, 2020, Caliber submitted a notice of claim to Chicago Title for its damages, as described herein, which are compensable under the title insurance policy and which Chicago Title is obligated to pay to Caliber.

293.   Chicago Title has confirmed its receipt of Caliber's notice of claim.

294.   Caliber has provided all information and documents requested by Chicago Title.

295.   However, despite repeated follow-up from Caliber through undersigned counsel via phone and email, as described herein, Chicago Title has indicated that, two months after Caliber's submission of the notice of claim, it is still investigating the notice of claim.

296.   Chicago Title has failed to accept the notice of claim and has failed to provide any indication of what it is investigating or specify when its investigation will conclude.

297.   Furthermore, Chicago Title has not acknowledged its obligation to reimburse or indemnify Caliber for its damages and Caliber has received no payment from Chicago Title in connection with Caliber's notice of claim.

## COUNT XI- VIOLATION OF FLA. STAT. § 627.792 (AGAINST CHICAGO TITLE)

298.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-297 of the Complaint.

299.   Fla. Sat. § 626.8473 provides "(1) A title insurance agent may engage in business as an escrow agent as to funds received from others to be subsequently disbursed by the title insurance agent in connection with real estate closing transactions involving the issuance of title insurance binders, commitments, policies

of title insurance, or guarantees of title, provided that a licensed and appointed title insurance agent complies with the requirements of s. 626.8417, including such requirements added after the initial licensure of the agent."

300. Fla. Sat. § 626.8473 also provides "(2) All funds received by a title insurance agent as described in subsection (1) shall be trust funds received in a fiduciary capacity by the title insurance agent and shall be the property of the person or persons entitled thereto."

301. Fla. Stat. § 627.792 provides, in turn, that "A title insurer is liable for the defalcation, conversion, or misappropriation by a licensed title insurance agent or agency of funds held in trust by the agent or agency pursuant to s. 626.8473."

302. Sunset Title holds a valid license as a "title insurance agency – corp or firm" from the State of Florida.

303. Sunset Title received funds from Caliber to be disbursed by Sunset Title in connection with the closing of Borrower's refinancing transaction for the Property, and agreed that those funds were escrow funds.

304. Sunset Title served as the issuing agent on behalf of Chicago Title for Borrower's refinancing transaction for the Property.

305. Chicago Title is a Florida-licensed title insurer and issued a title insurance policy, with Caliber as the insured, for Borrower's financing transaction for the Property.

306.   Sunset Title failed to disburse the funds provided to it by Caliber for Borrower's refinancing transaction for the Property in accordance with Caliber's instructions, and instead wired the funds pursuant to the false wiring instructions given to Sunset Title by John Does 1-10. As a result, Sunset Title converted or misappropriated Caliber's funds.

307.   Therefore, Caliber has been damaged as a direct and proximate result of Sunset Title's actions, including actual damages in the amount of the converted or misappropriated funds, $262,253.66.

308.   Caliber is thus entitled to recover that amount, $262,253.66, which was the result of the conversion or misappropriation of funds by Sunset Title as Chicago Title's issuing agent, from Chicago Title as the title insurer for Borrower's refinancing transaction for the Property.

## COUNT XII- VIOLATION OF 18 U.S.C. § 1030(G) (AGAINST JOHN DOES 1-10)

309.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-308 of the Complaint.

310.   18 U.S.C. § 1030(a)(4) prohibits anyone from "knowingly and with intent to defraud, access[ing] a protected computer without authorization […] and by means of such conduct furthers the intended fraud and obtains anything of value…" and provides that anyone who does so has committed a criminal act.

311.   18 U.S.C. § 1030(g) provides that "anyone who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages…" if, among other factors, the violation caused at $5,000 in damages.

312.   Under 18 U.S.C. § 1030(g), a "protected computer" includes one engaged in or which affects interstate commerce, and a "computer" includes any data storage facility or communications facility directly related to or operating in conjunction with such device, and thus includes networks and email servers.

313.   In order to learn and have access to the information needed to send the fraudulent payoff statement, John Does 1-10 had to know of or have access to, at a minimum: 1) the fact that PennyMac had a mortgage on the Property; 2) the correct PennyMac payoff statement sent by Caliber to Sunset Title; 3) the fact that Sunset Title was serving as the issuing agent for Borrower's refinancing transaction for the Property; 4) the fact that funds from Borrower's refinancing transaction had closed on or about December 29, 2020 and that the funds related to that transaction were to be disbursed on or about December 31, 2020.

314.   In order to learn or gain access to this information, John Does 1-10 must have accessed the computers, networks, or email servers of Sunset Title or Caliber.

315.   Caliber only transmitted documents to Sunset Title related to Borrower's refinancing transaction via an encrypted document portal. There is no indication that John Does 1-10 accessed this encrypted document portal.

316.   Therefore, John Does 1-10 gained access to the knowledge and information necessary to send the fraudulent payoff statement with the false wiring instructions through accessing Sunset Title's computers, networks, or email servers.

317.   John Does 1-10 accessed Sunset Title's computers, networks, or email servers knowingly and with the intent to defraud—specifically the intent to gather the information necessary to send the fraudulent payoff statement with the false wiring instructions in order to defraud Caliber and Borrower.

318.   Sunset Title's computers, networks, or email servers are engaged in or affect interstate commerce, as is confirmed by Sunset Title's use of its computers, networks, and email servers, at least some of which are located in Florida, to communicate with, and store information received from, Caliber, which was stored in and/or sent from outside of Florida.

319.   To the extent John Does 1-10 were not authorized to access Sunset Title's computers, networks, or email servers in the manner in which they did, the access was unauthorized.

320.   John Does 1-10's accessing of Sunset Title's computers, networks, or email servers furthered their fraudulent scheme by allowing them to learn the

information necessary to send the fraudulent payoff statement with the false wiring instructions, and ultimately to defraud Caliber and Borrower.

321.   Caliber suffered damages as a result John Does 1-10's accessing of Sunset Title's computers, networks, or email of at least $262,253.66, the amount which John Does 1-10 stole from Caliber through the use of the fraudulent payoff statement generated through John Does 1-10's accessing of Sunset Title's computers, networks, or email servers, as described herein.

## COUNT XIII- VIOLATION OF FLORIDA'S CIVIL THEFT STATUTE, FLA. STAT. § 772.11 (AGAINST JOHN DOES 1-10)

322.   Caliber realleges and incorporates herein by reference the allegations set forth in paragraphs 1-321 of the Complaint.

323.   Fla. Stat. § 812.014 ("Theft") provides, in pertinent part:

A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit from the property;

(b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

324.   Fla. Stat. § 772.11 ("Civil remedy for theft or exploitation"), provides, in relevant part:

Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of ss. 812.02-812.037 or s. 825.103(1) has a cause of action for threefold the actual damages sustained, and in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and courts costs in the trial and appellate courts.

325. Caliber has been injured by John Does 1-10's violation of Fla. Stat. 812.014, *et seq.*

326. John Does 1-10 knowingly obtained or used, or endeavored to obtain or use, Caliber's property with "felonious intent," either temporarily or permanently, to deprive Caliber of its right to or a benefit from its property or to appropriate the property to the use of any person not entitled to the property.

327. Specifically, John Does 1-10 knowingly obtained or used funds from Caliber in the amount of $262,253.66, based on Sunset Title's wiring of funds to John Does 1-10 pursuant to the fraudulent payoff statement and the false wiring instructions sent by John Does 1-10 to Sunset Title and based on the knowingly false representation made by John Does 1-10 that the fraudulent payoff statement and false wiring instructions were legitimate and true or accurate.

328. In doing so, John Does 1-10 intentionally used Caliber's funds in a way that Caliber had not approved, thereby depriving Caliber of its funds, which

remained Caliber's property until given to PennyMac to pay off Borrower's mortgage with PennyMac. Because John Does 1-10 stole the funds, the funds were not provided to PennyMac to pay off Borrower's mortgage with PennyMac and were not returned to Caliber.

329.   In doing so, John Does 1-10 intentionally appropriated the use of the funds in which Caliber retained a property interest, by taking the funds or by disbursing the funds to a person or entity not entitled to receive the funds.

330.   Because the identify of John Does 1-10 are presently unknown, Caliber has not yet presented John Does 1-10 with a formal written demand under Fla. Stat. §772.11, but will do so as soon as Caliber ascertains the identities of John Does 1-10.

331.   As a direct and proximate result of John Does 1-10's intentional acts and errors and omissions, Caliber has suffered damage.

332.   Pursuant to Fla. Stat. § 772.11, Caliber is entitled to recover from John Does 1-10, $786,760.98, or three times the current monetary value in compensatory damages for which John Does 1-10 would otherwise be liable ($262,253.66).

333.   Moreover, pursuant to Fla. Stat. § 772.11, Caliber is entitled to recover from John Does 1-10 the reasonable amount of attorneys' fees Caliber has had to incur in representing its interests in this matter.

**WHEREFORE**, Caliber prays for judgment as follows:

(A)    That Caliber be awarded, as against John Does 1-10, three times the amount of its actual damages for civil theft, with pre and post-judgment interest plus applicable attorney fees and all other applicable costs, fees, and penalties;

(B)    That Caliber be awarded its actual damages and, as appropriate punitive damages, for all of its other causes of action, as against one or all of Sunset Title, Chicago Title, and John Does 1-10, along with both pre and post-judgment interest plus all applicable costs, fees, and penalties;

(C)    That Caliber be awarded its attorneys' fees and the costs of the action as provided by law and otherwise by court rule; and

(D)    Any other and further relief, including equitable relief, as the Court deems just and proper.

## **JURY DEMAND**

Caliber hereby demands trial by jury as to all issues so triable in this action.

Respectfully submitted,

*/s/ Robert C. Folland*
Robert C. Folland (1007951)
BARNES & THORNBURG LLP
4540 PGA Boulevard, Suite 208
Palm Beach Gardens, FL 33418
Telephone: (561) 473-7560
Facsimile: (561) 473-7561

*Attorney for Plaintiff Caliber Home Loans, Inc.*